## DAUBENBISS v. WHITE et al.

### No. 14,519; November 10, 1892.

#### 31 Pac. 360.

**Public Land—Ouster of Occupant—Abandonment.**—An occupant of public land who is ousted by a stranger will not be presumed to have abandoned his right to possession, where, after a contest for a year, he ceases to contend against a superior force maintaining an armed resistance.

**Public Land.—In Ejectment to Recover Possession** of public land, plaintiff claimed under a deed from D., who had occupied the land without color or claim of title. There was no evidence of any act of possession on plaintiff's part, and several witnesses testified that defendants were in possession of the land in July, 1889. Held, that the evidence did not support a finding that D. sold and delivered possession to plaintiff in August.

**Deed—What Transferable by.—Bare Right of Possession,** without claim or color of title, cannot be transferred by deed, nor otherwise than by the former possessor yielding up or abandoning the possession, and permitting a new possession to be taken by another.

APPEAL from Superior Court, San Benito County; James F. Breen, Judge.

Ejectment by John Daubenbiss against Amos White and others. The court found in favor of defendants for a part of the land, and in favor of plaintiff for the remainder. A motion for a new trial was overruled, and defendants appeal. Reversed.

Briggs & Hudner for appellants; Montgomery & Scott for respondent.

HAYNES, C.—In ejectment. Plaintiff bases his right to recover upon prior possession alone. The answer denied plaintiff's possession and his right thereto, alleged prior possession in themselves to part of the land, title in one Robinson to part, and their right to the possession of such part under a lease from the owner. The cause was tried by the court, without a jury. The court found in favor of defendants for the part they held under lease from Robinson, and in favor of plaintiff

for the remainder. Defendants moved for a new trial upon a
statement, and this appeal is from the judgment, and the order
denying a new trial. The transcript does not show the date
at which the action was commenced, nor does it state the names
of any of the defendants except that of Amos White. We
gather from the findings, however, that the other defendants
were L. M. Ladd, as administrator of the estate of C. H.
Waters, deceased, and William Eastman. Prior to the trial
the defendants White and Eastman succeeded to the interest
of Waters, deceased. The land sought to be recovered is sec-
tion 23, township 15 south, range 6 east, M. D., in San Benito
county, and situate in the Gabilan mountains. Long prior to
1883 this section and other adjacent sections were in the posses-
sion of Root and Martelli, who used the same for grazing pur-
poses, for which alone it was useful. This tract contained
about three thousand acres. In 1883 C. H. Waters acquired
all the right of Root and Martelli, and entered into possession,
placed improvements thereon, consisting of fencing, houses,
and a barn, and pastured his stock on the whole tract. After-
ward Waters let White and Eastman into possession with him,
but at what precise date does not clearly appear, and con-
tinued in the exclusive possession of the whole tract up to the
year 1886, in which year the Dakan Brothers and one Burns
acquired possession of sections 14 and 15, lying adjacent to sec-
tion 23, and in May of that year drove their cattle upon sec-
tion 23, and expelled Waters' stock therefrom. The court
found, upon conflicting evidence, that Waters had a fence,
which with the natural barriers inclosed the whole tract of
three thousand acres, but that it was not sufficient to restrain
or to turn stock without the aid of herders, and also found that
there were fences, which with natural barriers nearly inclosed
section 23; that these fences also, at the time of the entry of
the Dakans, were generally prostrated, and insufficient, with-
out herders, to turn stock; that the entry of the Dakans upon
section 23 "was peaceably effected, and without passing
through gates or tearing down fences." There appeared to
have been disputes about the possession of other lands besides
section 23 between Waters and the Dakans, but touching sec-
tion 23 the court found: "This latter section continued to be
the subject of frequent and grave disputes between the parties.
These disputes led to a condition of armed hostility, in which

threats of violence were exchanged, firearms were exhibited, and melees indulged in. Continuously throughout this state of affairs, the Dakans maintained themselves in the possession of section 23 by force of arms and superior numbers. Finally, after about a year's contention, Waters recognized the superior might and right of the Dakans to the possession of section 23. The Dakans continued to herd their cattle thereon, and excluded all other stock therefrom until they sold out to the plaintiff. That in August, 1889, the Dakans sold and delivered the possession of section 23 to the plaintiff, who at the time last stated entered upon section 23 with a herd of cattle, and pastured the same thereon, to the exclusion of all others, until September, 1889, when the defendants entered, and ousted plaintiff from the possession and still exclude him therefrom.'' The defendants White and Eastman participated in the controversy with the Dakans respecting that section. The pre-emption entry of Robinson was perfected February 18, 1889, and covered the northwest one-quarter of the northwest one-quarter, and the east one-half of the northwest one-quarter of said section. The remainder of the land in controversy is government land, to which it is conceded plaintiff has no right unless he acquired a right of possession by an alleged conveyance from Dakan, or by otherwise obtaining a possession prior to that of defendants. Following the formal findings of fact in the transcript is the decision or opinion of the court, consisting of a restatement of many of the facts and conclusions therefrom, and arguments upon questions of law, and following which are conclusions of law ''from the foregoing facts and opinion.'' From this decision, as well as from the findings, it is apparent that the court concluded that the acquiescence of Waters and his associates, the defendants, in Dakan's possession, destroyed his right based on prior possession. In its opinion, the court conceded that relief could not be granted where the plaintiff's possession was a mere scramble, or maintained by force, violence or threats; but added that this did not continue during the whole time of Dakan's possession. ''Peace succeeded the hostilities, and he [Dakan] was not compelled to maintain himself by force or violence during the last year of his occupation''; and that it was not material whether the submission was compulsory and solely in the interest of peace. The findings, thus construed (and without the comments of the

court they could bear no other construction), do not justify the conclusions of law drawn therefrom, nor support the judgment. It would be monstrous that a right conferred by a prior peaceable possession could be lost after a contest kept up for a full year, simply by ceasing to contend longer with a superior force maintaining an armed occupation. The defendants might have resorted to law, but they were not bound to do so within a week, a month, or a year. They might safely await an opportunity to re-enter peaceably, as they afterward did. Their cessation from an armed contention cannot be construed as an abandonment of their prior right, and such right could only be lost by abandonment, or by the occupation of Dakin for the period of the statute of limitations. There is no finding, nor any evidence upon which any finding could be based, that defendants' entry, after the alleged possession of plaintiff, was not peaceably made and peaceably maintained.

But aside from this, if the findings as made were sufficient to support the judgment, the fourth finding is not justified by the evidence. This finding is that in August, 1889, the Dakans sold and delivered the possession to plaintiff, and that plaintiff then entered with a herd of cattle, and pastured the same, to the exclusion of all others, until the alleged ouster in September, 1889. Plaintiff testified that he "obtained the land in controversy from William Dakan; received a deed." The deed was offered and received in evidence against defendants' objection. The record nowhere shows the date of the deed, nor when it was delivered, but does show that "it was acknowledged December 14, 1889, after the commencement of the action." The plaintiff further testified that he did nothing to section 23; that he had an agent, his son, thereon, but did not know what he did. The son, F. B. Daubenbiss, testified that he went to this place the 3d or 4th of August, 1889; that as he was on his way to take possession, he met the Dakans with their cattle at Watsonville, forty or fifty miles from this land; that they (the Dakans) were to keep their cattle there until August 1st, but took them away before he got there, and that he reached the land two days after he met the Dakans at Watsonville. Neither he nor the plaintiff nor any witness testifies that either the plaintiff or his son had any cattle, or ever put any cattle on the land, or that any act of possession

38

was ever performed by or for the plaintiff. The Dakans had neither title nor color nor claim of title to the land. If by their occupation they had acquired any right, it was that of possession simply; a right which was wholly lost by their leaving the land, and removing their stock therefrom. All the circumstances show that they left without any intention of returning, and their leaving under such circumstances was an abandonment, and they could not put the plaintiff in possession after such abandonment. Nor would it aid plaintiff's case if the deed had been delivered, as it possibly was, before the commencement of the action, or when he met the Dakans at Watsonville, or before they left the land, for the reason that a bare right of possession, without claim or color of title, cannot be transferred by deed, nor otherwise than by the former possessor yielding up or abandoning the possession, and permitting a new possession to be taken by another. A deed only transfers title and the incidents flowing from title, or some right, as of possession, where the right depends upon title. In Society v. Dalles City, 107 U. S., at page 344, 27 L. Ed. 545, 2 Sup. Ct. Rep. 672, the court said: "All persons, therefore, who settled upon the public lands acquired no rights thereby, as against the government. They were merely tenants by sufferance. The most they could claim was the right of actual occupancy as against other settlers. Such an occupant could yield his right of actual possession to another settler, but he could convey no other interest in the land. If he abandoned the land, and another settler occupied it, the former lost all right to the possession. If he transferred the possession to another, and the transferee abandoned the land, the first possessor could claim no right in the land unless he again took actual possession." And on page 345, 107 U. S., and page 679, 2 Sup. Ct. Rep., in relation to the transfer in the case then under consideration, the court said: "The method adopted by the appellant to turn over the station to the American board by an actual transfer of possession was as effectual as any could be. It could be done only by yielding the actual occupancy, and this could not be effected by a written transfer. It could be accomplished only by the going out of one party, and the going in of the other." If it be said that the Dakans had improvements on the land which might be the subject of transfer, the deed was inoperative for that

purpose, as it only purported to convey the land, and, being ineffective for that purpose, did not convey or transfer improvements upon the land. Besides, by the abandonment of the land, the Dakans lost all right to the improvements, if any they had. Section 1013 of the Civil Code provides: "When a person affixes his property to the land of another, without an agreement permitting him to remove it, the thing affixed, except as provided in section 1019, belongs to the owner of the land, unless he chooses to require the former to remove it." Section 1019, above referred to, permits a tenant to remove certain things affixed to the premises during the continuance of the term. Not only is there no evidence that plaintiff ever had possession of the land in question, but there is evidence strongly tending to prove that defendants were in possession and had their stock on section 23, in July, 1889. Defendant White testified that in July, 1889, he drove everything off section 23 except his own stock; that he also saw Eastman's cattle on section 23 during the early part of 1889; and that he had been in possession, and had a man on section 23, since July, 1889. Harry Waters testified that in July, 1889, he had helped White drive one hundred and fifty head of Dakan's cattle off section 23, and saw some of White's cattle on the place at the time. Appellants also attack the finding that the entry of the Dakans was without passing through gates or tearing down fences; and that the fences were generally prostrated. The findings, as well as the evidence, show that Waters and his associates, the present defendants, were in actual possession of section 23 prior to the entry of the Dakans. It was not at all essential to such actual possession that the land should have been inclosed with a fence sufficient to turn stock, or that it was fenced at all. In McCreery v. Everding, 44 Cal. 246, the court below charged the jury that: "Neither complete inclosures nor any inclosures at all are essential to a possession of land. If the claimants, although they had no fences, yet exercised dominion and control over the land, and subjected it to their power, the matter of fences becomes immaterial and unimportant"; and this court, approving the instruction, said: "It is well settled that actual possession of land may be had without fences or inclosure": See, also, Sheldon v. Mull, 67 Cal. 300, 301, 7 Pac. 710; Goodrich v. Van Landigham, 46 Cal. 603. The only importance

properly attaching to the fences in the case at bar is that they served to mark, in connection with the use made of the land, the boundaries of the actual possession by the defendants. Any other physical and visible signs, clearly indicating the extent of the possession, would have served the purpose. The fences were erected for the purpose of confining cattle to the range inclosed, and excluding the cattle of others, and, whether sufficient for that purpose or not, clearly marked the extent of their possession. The fact that the Dakans drove their cattle in without tearing down the fence and drove defendants' cattle therefrom did not affect the character of their entry. Several exceptions were taken to the rulings of the court on the admission and exclusion of evidence, which should be briefly noticed. The deed from Dakan was, as we have seen, immaterial, whether defective or not, and was improperly received. There is not enough shown in the transcript to enable us to determine whether the exclusion of the certificate of the surveyor general touching White's application to purchase the land described in the certificate was or was not erroneous. Neither the date nor the substance of the certificate is stated, nor does the transcript show that it covered the land in controversy, or any part of it. We find in the opinion of the court a description of the land described in the certificate, and the statement that it was offered for the purpose of proving title, while if offered generally, or for the purpose of proving color of title, it would have been competent. We are not disposed to pass upon a question so defectively presented by the record. It is not necessary, in many cases, to do more than to state in the record the substance of papers offered in evidence, but where any question is raised as to the effect of any written instrument, enough should be stated for that purpose, and if the whole instrument is essential to a proper construction, then it should be set out in full. The judgment and order appealed from should be reversed.

We concur: Vanclief, C.; Belcher, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order appealed from are reversed.